21-1126, Solar Energy Industries Association, Petitioner, v. FEDERAL ENERGY REGULATORY COMMISSION Mr. Marwell, for the Petitioners Edison Electric Institute and Northwestern Energy Ms. Curley, for the Petitioners Solar Energy Industries Association Mr. Fish, for the Respondent Mr. Lowe, for the Intervenor Morning, Mr. Marwell Morning, Your Honor And our one remote counsel, Ms. Curley, can you hear us and see us? Yes, everything is working great, thank you All right, why don't you go ahead Thank you Good morning, Your Honors May it please the Court Garry Marwell, for Petitioners Edison Electric Institute and Northwestern Energy We'll try to reserve two minutes In 1978, Congress conferred special benefits on small generators whose power production capacity is no greater than 80 megawatts Breaking new ground from 45 years of agency practice and precedent, FERC's orders here awarded qualifying status to a facility that produces twice that much direct current, or DC, power Those orders should be vacated because, first, they're contrary to the plain language of the statutory size cap, and second, they arbitrarily depart from the convention Doesn't it depend on the definition of one word in the statute as to whether it's contrary to the statute or not? Excuse me, Judge, since I'm sorry Capacity is the word, right? I think it's power production capacity, and I think we would read those three words in context and together as a phrase But if you read the word capacity as the commission is now defining it, then this is not contrary to the statute, it's simply a different interpretation Is that not correct? So I would not agree with that, Your Honor I think, first, we think there's a generative problem with the definition of capacity in the commission's appellate brief And the commission acknowledges in a footnote that that definition is absent from the orders under review And so I think that's an oddity in a case where the commission is requesting Chevron deference I mean, our basic argument, and I think the commission agrees with us, that production means creation or generation They explicitly agree with us on that And power, I think the key part of our argument, is that that means, and I don't think there's any disagreement on this either DC or direct current power and alternating current or AC are both forms of power And so we have offered definitions of the word capacity that align with the statutory context that are ordinary meaning And our basic position is this is a size cap that applies if you are over 80 megawatts of AC or DC And the commission's position we submit is contrary because they say direct current or DC power doesn't count And that, I think, is the crux of the plain language argument There's another oddity, I think, in the commission's position And that is that the orders focused on the notion of production as send out or delivery But I think their appellate brief attempts allied the distinction between the statutory word, which is production, and the concept of delivery And they say, well, it's only AC power that counts for delivery out to the grid It's only the production of AC power for delivery out to the grid that counts And I think that's, we think that's contrary to the statute because it reads out a meaning of the word power Well, how is that wrong if the power that utilities can be required to purchase, there's no question that it's AC power I mean, if this broad view offered DC power, there would be no requirement that the utilities purchase it, would there? Well, under the statute, the utilities have an obligation to purchase the net output of the facility And I think this is maybe a helpful distinction because the commission relies on cases from this board And also prior orders that talk about what the utility is required to buy And that's a different textual inquiry But just back up, I mean, I understand that you would distinguish the different provisions But just for my question, let's say this was an 80 megawatt facility with 80 megawatts of solar arrays and no inverter So there's no question that it's small and that it meets the PURPA definition And if broad view then said, OK, we're small, we qualify, you know, everything in the statute is met You have to buy our power, you can purchase inverters and install them What would your position be why the statute prevents that? And if it doesn't, it would seem to me that their position that our production capacity refers to AC power finds some support And I'm not fighting the notion, I think everyone agrees that AC power is a kind of power Well, and is the power that's expected to be delivered on the grid, would you agree? Well, if I could try to come at that question So the regulation that governs our utilities obligation to purchase is different And this is 18 CFR 292.303 And that says there is an obligation, each electric utility shall purchase energy and capacity, which is made available from a qualifying facility And this is the sort of fountainhead of the cases and the commission precedent that the commission relies on here to say, well, there should be symmetry between size cap What you have to do to be in the program at all and and what the utility is required to purchase And I think the key textual point is the regulation says made available And that sounds a lot to me like delivery or send out They are making that power available, but that's not the text of the threshold qualifying facility definition in the statute, which is power production capacity So it's production versus made available I hope I hope that answered your question, but I'm not sure that that it did, but let's move on I had another question about. Reading your brief and looking at the facts in the case, it seems that really the gravamen of your position is that Broadview has done something manipulative or devious, artificial And I'm not sure how how they have or what in the statute requires, you know, non artificiality It seems like, you know, there is this 80 megawatt cap and Broadview has tried to deliver power and maximize its capacity factor in doing so Because the low capacity factor is a notorious problem with with solar photovoltaic energy And, you know, they've been rather rather clever, but it's it's business planning It seems like it's the kind of thing we see in almost every case where somebody says, OK, here's here's this requirement I'm going to go right up to it and they do comply with if you know, with a 80 megawatt delivery power production capacity in the form. That is usable. So I guess my question, it was long winded, I apologize, my question was about sort of the artificiality or the notion that there's something nefarious going on here Well, I don't think there's anything out of our point is not that it's artificial to include inverters and you need to do that But what's artificial or I guess what what we try to provide in our brief in terms of context is that when Congress has provided a numerical threshold, it was clearly part of the bargain Facilities in this program get very favorable commercial treatment. We are legally obliged to buy what they're selling. You know, that's unusual in the market. And I think now you're a little bit undermining your effort to distinguish the two provisions of statute, because that's exactly right. And you only having to buy. Well, I think the point is, when you have a statutory size cap like that, it is important to give meaning to it. Even when you have sophisticated, well-counseled developers working to come either right up to or, in our view, beyond. And the reality is, and the commission admits this in their orders, this is a very unusual facility in the 44 years of PURPA because it's got 160 megawatts of solar array. That's not something we've seen. And so I think the point is not that there's sort of ill intent, but that it's important to police what Congress, the appeal Congress had when they enacted the statute. Could I briefly talk about the second argument, which I never got to? We're going to give you more time. But on that, I mean, one of the pieces of reasoning in Occidental that the commission relies on in the re-hearing orders is that there's nothing in the statute that requires a perfect match between the capacities of different components of a facility. And I can't remember which uses the elevator example. You have a bolt and you have a cable. And if one of them is rated higher, you wouldn't say that the weight rating of the entire elevator is thereby higher. It's sort of you look at the common denominator of all the necessary parts, and the statute does use the term facility. So I guess the question is, is this not at least a reasonable available interpretation? So I think we think no. And there's there's two. There's a there's a part about the reading of Occidental and Malacca and commission's orders. This gets into my second point. But, I mean, I think the key point in response to the elevator hypo is that what the statute here. You know, you might say the elevator has a delivery capacity and deliver you from the first floor to the second floor. But here we have production capacity. And so what we think the statute is looking for is the generating aspect of the facility. Right. That's why we look to the solar array and not the inverters, which even the commission describes in its orders as conversion power, not generating power. On Occidental and Malacca, quickly, what they say and why we think there's an arbitrary and capricious argument separate from our textual argument, even if you agree with me on plain meaning, is that you can net the 80 megawatt calculation by subtracting. You start with gross power and you can net out or you can subtract power that's consumed by the facility as part of the power production process. So you essentially. The Massachusetts Refuse Tech case, which is cited at page 46 of our blue brief, I think is it articulates the Occidental Malacca test well, and it basically says you're only subtracting things that are internal to the power production process. And our position on the second argument is that generating power and then diverting it to the battery, be stored and later delivered to the grid is not a loss or a deduction that's internal to the power production. Why not? Because because the thing that generates power is the solar. I mean, it's this distinction between production and delivery. Well, it's internal to generating power with a higher rated capacity. It's a it's a whole system of saying we're going to take we're going to have more arrays online so that we'll be meeting the 80 even on a dim day. We'll be seating the 80 on a really sunny day at noon. We'll put that on the battery and we're still at no time ever going above 80. And it really seems like it's a it's a problem distinct to solar and maybe wind where there are these ebbs and flows because of the resource. I think that works, but only if you only if you're viewing what's being produced as AC power, which is in our view what's being delivered or sent out, not what's being generated. I don't mean to go in circles with you. I'm trying to know, but. What's your best argument that Chevron does not apply? We have three or four, but what's the best? Well. Two, I guess first is and maybe this maybe this is just step one of Chevron plane meetings for the court. And that's that's the first. I think the next level argument is. Really, the heart of the commission's position on appeal is this industry, what they say is an industry specific. And there's this remarkable footnote in their brief where they say that is absent from the order. So I think under Chenery, that's a real problem for the court. If you're going to reach our Chevron step to argument, we may both breathe. That's pretty classic that you don't defer an argument that shows up for the first time in an appellate. But one could shear away that argument and the reliance on that industry specific definition. And I don't read their brief to be saying we think we're Chenery barred from relying on everything else we say about power production capacity and why we think it's best defined. The way we defined it and they make arguments about that explicitly in their orders. Those are clearly not Chenery barred. So I think you're reading that concession to cover a bigger argument unit. That's maybe. And I didn't mean to overstate. I think the footnote to be fair to the commission refers to the argument they're making about the industry specific. The question then becomes, as you say, your honor, how essential is that to their position on appeal? And can you somehow chart a course that I guess avoid stepping on or stepping into that definitional point? But I do think the prominence of that argument in their brief suggested the commission views it as important. And I think. If you if you share that away, then you're left with production, our and our definitions of the work capacity, which we think are both consistent with ordinary meaning and consistent with the notion that in a technical context, under the Supreme Court's Van Buren decision that you would look to sort of context specific meanings. I think that's how I read Van Buren. It says there was a statute about computers. And so we're going to look for meaning that is appropriate in the context of computers. And that's what we've done here. I think if you look at the dictionary definitions, we breathe. We are not picking the ones that are obvious in that. And under Chevron step one, I think the court, you know, the existence of definitions of something like the word capacity that are just obviously not on point. Like, you know, the chairperson spoke in his or her capacity as chair. That's obviously not the meaning. But I think we can still have a plain language argument. It's generally to be a problem. Wouldn't we have to have something involved in what we're deciding here? It is not supported by the original decision effort without regard to how things are phrased in there. Well, I guess I understood Henry just until the mean that the court is limited to the reasons that the agency gave in the order under review. That's what I'm getting to. Aren't we really being asked to decide it for the reasons that were consistent with the order under review? Well, I didn't see the commission's current definition of capacity, which is echoed by interveners in the orders under review. And so that that's why we made the Chenery. There's always so much briefing about the meaning of all the key terms, except there's hardly ever any briefing in Chevron cases about what the word ambiguous. And the whole Chevron analysis hinges on whether ambiguity is triggered. What do you think ambiguity? Yes, I, I think it means that. The court first needs to do the detailed textual work of looking at the words that Congress and that and include and should include ordinary meaning, dictionary definitions, context, purpose, all the traditional. And I think it's only after you do that hard work. And if you're left with, I think, just deep uncertainty about is it this or is it that? So I do think that the crux of our lead argument here asks the court to do that detailed work and not just sort of fall back on on deference or ambiguity to to reactively. And I don't mean that is critical in any way of court. I just think that that that's the that's how I. And I think we think there's enough here in the plain meaning. Thank you. All right. We will give you the two minutes that you saw. But we took we took you off onto a lot of questions that we had, as is our want in this court. All right, we will now hear from Ms. Curley for the would be intervenors, Solar Energy Industries Association. Yes, good morning, your honors may please the court. My name is Heather Curley. I'm counsel for Solar Energy Industries Association, and I've let the time keepers now I'd like to reserve two minutes for rebuttal if possible. And just for clarity of the transcript, I'll be referring to the Solar Energy Industries Association by its acronym SIA written S.E.I.A. Mr. Marwell discussed a breadth of issues with this court, but but see his issue is is much more limited in its application. Broadview Solar presented a fact specific question regarding a configuration of solar panels, battery modules, transformers, inverters and associated wiring. Broadview Solar then requested that the commission affirm its status as a qualified small power production facility under purpose. Had the agency limited its ruling to the question presented, CO would not be before this court. Broadview Solar is not a SIA member and SIA had no interest in the proceeding prior to FERC's initial orders. Because, in fact, during the pendency of the Broadview proceeding, SIA was actively involved in the first PURPA rulemaking and in the first PURPA rulemaking. We are aware of background. I'm curious, as a practical matter, what what specifically could you do? As an intervener that you cannot do as amicus, what is it that that you're seeking to have an opportunity to do in this case going forward? Sure, Judge Pillard, we're a petitioner in the case, and we're seeking a finding that our participation was unreasonably denied in the proceeding. If this court remands to the agency, we wish to participate in that remand proceeding because we anticipate a similar remand from the 9th Circuit on this exact statutory phrase. We think the issues need to be considered together, or if not considered together, at least for SIA to have an opportunity to consider how power production capacity harmonizes with FERC's revised rule defining same site, which is the antecedent of our statutory phrase. To answer your concrete procedural question, you would be able to make arguments, legal arguments, if you participated on an amicus basis. Is there something record based if there were a remand? When I think about the difference between amicus and intervener, the intervener has a party status. It's puzzling to me what you think is, I understand that you think you were whipsawed between something that you anticipated, if it was going to be raised at all, would be raised in a rulemaking and not in an adjudication, and that didn't happen, and that seems unusual. But when you're seeking intervention, you have to identify some stake, and I'm not sure that I understand what's animating SIA in this case. I'm sorry, I misunderstood your question. Intervention in the agency docket is what you're asking about, or intervention in this? Isn't that what you're seeking? Yes, I'm sorry for misunderstanding the question. So, SIA wishes to intervene in the proceeding to have the correct standard developed. SIA had submitted a request for rehearing, which was not considered in this proceeding, but SIA has a lot to say about the panel rating, the inverters, the wiring, and the transformers, and how that relates to the send out rule. And there's no other party in the proceeding who has the knowledge base and experience in solar installations as SIA. Broadview Solar has its one project, and because the send out rule will have an industry-wide application, and is not an intervener, there will be no party to present this information. Ms. Curley, I took Judge Pillard's question to be, why can't you do everything you just said as an amicus? In a FERC proceeding, there is no amicus. To be able to participate in the proceeding and have our views considered, we have to be an intervener, which is why we're here. We had wanted our views considered on some of the issues that were discussed. FERC does not consider them unless we are a party. How long had the proceeding been ongoing before you made your application to intervene? Sure. So, the proceeding was initiated shortly after FERC had just released NOPR. It was told for the pendency of about 11 months, so nothing had happened. FERC's final rule issued, and then the Broadview order issued. When SIA had notice of the Broadview order and its finding, SIA intervened 27 days later. We did not have immediate notice of it, but as soon as we did, marshaled the resources of the agency and had a petition to intervene on file in 27 days, which was before we submitted our rehearing request. The question of Broadview's qualification as a small entity was before the commission in this proceeding for something over 11 months, so before you filed your petition for intervention, right? Whether or not the facts specific of these inverters and this wiring met the commission's definition was before the commission. What did you understand the goal of the participants in the litigation to be before FERC? We understood that they would rule whether or not Broadview's specific configuration complied with the send-out rule. We did not imagine that FERC would reconsider the send-out rule as a whole. But that was sought. EEI explicitly called for abandoning Occidental in its filings in the Broadview docket, so I understand that it may not have made sense to you to be closely monitoring that, but that was a position that was articulated. Presumably, you're now so interested in being involved in the cases because you think it could be re-raised. If there are two issues, I would say one, we thought the issue was under consideration in the ongoing rulemaking where a very similar issue was being discussed and this exact statutory phrase was being debated. So we had envisioned that those issues would be in our rulemaking proceeding. But on your point about EEI, EEI was an intervener in that proceeding, so the prime applicant as well as the purchasing utility did not challenge the send-out rule. Had CEA sought to intervene after EEI's comments, CEA could have. It would have still been late. It would have been less late than we are now, but it would have been at a much later stage of the proceeding. Whereas when CEA sought to intervene. I'm sorry, go ahead. You are to apply to this issue. Can you repeat your question? I didn't quite hear it. I know you were still talking. You never learned that you don't talk while we're interrupting this. Different rule of courtesy than normal. What did you understand to be the goal of the commission before the commission in this proceeding? I understood the goal of the commission to be to rule on whether broad views arrangement of modules, inverters and panels complied with the send-out rule. Why wasn't that sufficient to give you notice that you would be interested in the outcome of the proceeding? Well, I would say two things. There are thousands of QF documents opened at FERC. And second, we were involved in a rulemaking where the statutory phrase was being considered and we didn't. You didn't intervene in this one. What is the standard of review that we apply to FERC's decision to not allow your intervention, your untimely intervention? An abuse of discretion, your honor. Discretion. We would be saying that it is an abuse of discretion not to allow an 11-month late petition because the would-be intervener did not anticipate the precise result that happened in the proceeding? Are we going to make a precedent like that? Your honor, we think the error was in failing to consider anything other than timeliness without considering the agency's own role. In many of those months, the proceeding was told, we thought, pending the outcome of the rulemaking. We believe FERC was obligated to consider other factors such as prejudice. And there's a list of factors in FERC's rule as well. But considering only timeliness without considering how the agency's own role contributed to that timeliness delay, we think that was the abuse of discretion. We do agree that the agency does not have to allow every potential intervener, though I will note that for QFs only, so this particular type of proceeding, FERC allows any person to intervene and does not impose the interested person standard. I'm really baffled by your standing argument. As I understand it, you characterize your injury as having been effectively precluded by raising a merits challenge to the send-out rule. Because it wasn't in the rulemaking. It wasn't in the Ninth Circuit. You didn't think you had reason to raise it in the Ninth Circuit case. That was briefed before. And then you're excluded from doing it here. But loss of a litigation position, I'm not familiar with any case that says that's an Article III injury. And I know this is a long question, but the second part of my question is, why wouldn't you claim that the harm is harm to your members of having the send-out rule on the chopping block? It seems like that is the harm, the underlying harm, Taseya, is this rule is disastrous for our industry. We represent the industry. We know that the Commission has now ruled in rehearing in a way that's favorable to us, but this case isn't over yet, and we need to be present. Why wouldn't that be the injury? And if it were, it seems to me you disclaimed that injury. Which is mystifying to me. And that in order to claim it, you would have to identify members. And you would have to have a declaration saying, look, I'm planning to build something like what Broadview's building, and I clearly would be harmed if the Commission or if the Court were to rule or the Commission were to rule as it did in the initial order. I'm just not clear why that wasn't your standing argument. Yes, Your Honor, I think this proceeding is, and all that underlies this is incredibly unusual, especially in the rulemaking and in the separate adjudicatory proceeding. I will note that a number of our members are amicus in support of FERC in this proceeding. They do wish to see the send-out rule maintained. I think we are hoping that this Court will maintain that send-out rule. But you are right, if you do remand, SIA would be injured by not being able to participate. Though, again, this is one issue in all of FERC. Go ahead. I don't think it's the failure to participate that's the injury. In fact, one of my buried questions in my long discourse was, what is your best authority that loss of a litigation position or opportunity is not a re-injury? I don't think that is. I think that Article III injury would be the ultimate harm to members and the procedural inability to participate to enhance the chance that the outcome would be what you want. But you haven't done what you would need to do to put that at issue. So I agree with you that the Article III injury is small, and I don't disagree with what you've laid out there. And so I don't know if I have more to add to the discussion. I was wondering if you could clarify the relationship between this case and the Ninth Circuit case. It may not matter ultimately, but what's going on there? Sure, we're waiting a decision after oral argument and briefing has been completed, and we're waiting a decision from the Court. I thought you said you were expecting a remand in the Ninth Circuit? I think we are hopefully expecting a remand, yes. All right. All right. As we did for Mr. Marwell, we'll give you a couple of minutes for a rebuttal, and we'll hear now from the Commission for Mr. Fish. Good morning, Your Honors. May it please the Court, Jared Fish for the Commission. There are two ways that the Commission wins in this case. One focuses on the term power production capacity, and the other focuses on the term power production capacity in terms of the facility as a whole. Beginning with the first basis. In our orders, this is important, in our orders, we define power production capacity as, quote, output in a form useful to an interconnected entity. That's at paragraph 18 of our Secondary Hearing Order JA-283. In our brief, we provide technical definitions of the term capacity in the context of power production that accord with the rationale we provide in our orders. The Energy Information Administration, the premier source of energy information and statistics. Sorry, I just have one request for you. We're not a time stickler court, and I think it would help if you spoke a little more slowly. Oh, I'm sorry. I'm sorry. It's all right. I will be more deliberate. So in our brief, Your Honor, we define the term capacity in the context of power production in a way that accords with the rationale we provide in our orders. The Energy Information Administration defines capacity in the power production context to mean, quote, maximum output that a generating equipment can supply to system load. System load is demand that can actually use energy. The only output from the Broadview facility that can supply system load is 80 megawatts, because that is its only alternating current output. The statute that says facilities power capacity does not say AC power production capacity. It seems like that would cover the phrase power production capacity would cover AC or DC. I disagree, Your Honor. If the statute said maximum power production, then perhaps because power is DC or AC. But it's talking about capacity. What type of capacity? As Mr. Marble stated, there are lots of different definitions of the word capacity. It can mean the legal mental state to enter into a contract. Obviously, that's not the definition here. Congress clarified what definition pertains by preceding the word capacity with power production. What type of capacity relates to power production? The output that serves system load. Their definition, by contrast, hits the words power production against the word capacity. Could you address the hypothetical that is in Edison's brief where they talk about this actual facility. California has a 579 megawatt, five square mile solar facility. And they say under your theory, you could send out 80 of that. And you could use, I guess, the other 499 without sending it to the grid. To power a factory or something. And that would still qualify as a small facility under your approach. No, Your Honor. I disagree. It most likely would not qualify. Why is that? The reason is because there, the useful output, the output that can serve system load, would be a combination of the 8 megawatts of alternating currents released from the inverters combined with whatever other output goes to a factory. So in that case, and that's, I mean, I think that's correct that that's the way it should be. But you're not making everything depend on what is sent out to the grid. Right. Well, send out is shorthand for what the useful output of a facility is. I mean, that's what Occidental, Malacha, Pentec papers are talking about. They're talking about the ability to displace otherwise derived fossil fuels. So in terms of what the facility produces that's useful. I have a math equation in my head. Yeah, well, I'm worse. I don't, but it's 80 plus 50 equals 130. And I want you to tell me why this math equation does not solve the case. 80 plus 50 equals 130. At any one moment. And the plant a question. Broadview is producing 80 that it immediately delivers. It's producing 50 that it stores in the battery and later delivers. So at any one moment, it's producing 80 plus 50 and all 130 eventually gets to it. Respectfully, your honor, that's incorrect for two reasons. First, when we're talking about useful power, we're only talking about alternating current power. And the 50 megawatts that's stored in the battery is direct current power. It's not useful to anybody, at least not with a broad view facility and how it's connected to the grid. And the second point is, as soon as you start talking about amount that can be sent out, sent out over time, we're in a whole different realm. We're talking about electric generation. We're no longer talking about capacity. Electric generation measures delivery of energy over time. And it's measured in megawatt hours. Here we're talking about capacity megawatts. And the only useful power that the whole facility can supply at any one time is 80 megawatts. That much is undisputed. I mean, the utilities even admitted in their brief that from Northwestern's perspective, they're only getting 80 megawatts of capacity. And maybe I can get on board with everything you just said. But in order for me to get on board, do I have to conclude that DC power is not power? DC power is power. But the question here is, what does the term capacity mean in terms of power production? Capacity relates to useful output, output that can serve system load. So we're not quarreling with the fact that DC power is power. I mean, no product is useful until it's delivered to its user. So if I have a factory that makes widgets and I make 130 at a time, 80 of which I deliver out the door that minute, 50 of which I deliver later on in the evening, none of those are useful widgets until they're obtained by the user. No, Your Honor, respectfully, that actually does talk about delivery versus output. And our orders are very clear. We're not talking about delivery. We're talking about output. In that example, I assume we're presuming that the widgets are complete on production, whether they're stored or not. So if you had 160 widgets that were produced, notwithstanding that 50 of them are stored somewhere, those are useful widgets. Maybe you haven't delivered them yet, but they're still useful widgets. Here, the 160 megawatts of direct current power isn't useful until something else happens, until the inverters convert that power into alternating current. And I know I just used the word convert, but I'd like to make one very important clarification. The inverters are electric generating equipment. We make that point at paragraph 33 of our first rehearing order, JA-207. It's also codified in our regulations, and I'll say it slowly because this is not in our brief. 18 CFR section 292.202 subsection T defines electric generation equipment to include inverters. So this builds into the second way that we went. Power production capacity of the facility as a whole. Well, as we explained in paragraph 24 of our first rehearing order, if you look at the facility as a whole, you look at all the electric generation equipment involved. So we reasonably considered both the inverters and the solar array and gave meaningful effects to both. I have a question about Chevron step one, step two, and partly about the exercise of agency expertise. So is power production capacity a phrase that's best where it's given to the agency to exercise its expertise in interpreting it? I believe so, Your Honor, at least in the first instance. Obviously, it's the court at the end of the day that has final say over what statutory terms mean. But here, I think that we reasonably interpreted a technical term, which is within the agency's ambit. And I'll note also, this is not, as opposing counsel said, this is not the first time we've come up with this rule. We've adhered to the rule that it's useful output, the amount of power that can be displaced on a grid, has the test for power production capacity for over 40 years. And to the extent that they argue that, well, you can't rely on our technical definitions because it's not clear that they existed in the same form in 1978, that's also incorrect. I think their more powerful argument is you can't rely on your technical definition because you raise it in the brief and it wasn't relied on. As you yourself concede in page 40, footnote nine of your brief, this is a litigation raised point. I was surprised that that was your leading point in your argument today. So what is your claim for deference that excludes that US EIA definition? Well, it's the definition that we provide in our quarters, paragraph 18 of the Second Rehearing Order. Output, power production capacity means output in a form that's useful to the interconnected entity. And that definition is based on, A, congressional intent, which is the lodestar of any statutory analysis. The whole intent behind PURPA, at least as it concerns small power production facilities, is to displace fossil fuel fired power on the grid. Well, the only way that you're going to determine that... What's the expertise, though? Congressional intent is something that we also look to. So when you talk about being entitled to use the agency's expertise in interpreting power production capacity, and that's a compelling argument, for Chevron deference, I'm interested in having you help us identify in a more kind of specific way what expertise bears on the interpretation in this case and help us see in the orders how that was manifest. Yes, Judge Pillard, I think the expertise comes to bear on the arcane nature of power, how you can have direct current power produced in one part of the facility and how that's transformed into alternating current power in another part, whether that conversion process actually is production in and of itself. I think all of those questions pertain to our knowledge of how electric projects, particularly solar photovoltaic projects, operate in the real world. Can you square that answer with your statement in No. 9 of your brief? And you're talking about the meaning of capacity, quote, capacity, and you say it turns on legal principles of the sort that a court usually makes. Here's, I think, the money phrase, and not determination specifically entrusted to an agency's expertise. Right. Well, honestly, I wish almost that we hadn't included this. It's a little bit self-conscious, and I don't think it's particularly necessary because all that footnote I need to say is... Sometimes a gaffe is telling the truth when it's not in your interest. Well, I mean, the end of the footnote says, you know, the utilities are wrong that the commission is barred from offering additional legal arguments on appeal that support the commission's statutory interpretation. So all we're saying there is, look, we realize that these additional definitions are not included in our orders, but they bolster the reasonableness of the statutory interpretation that is in our orders. And the question for Chevron deference is whether our statutory interpretation is reasonable. That's Chevron Step 2. Chevron Step 1 is whether you just lose on the plain meaning of the term. And I do think your answers earlier were helpful to me, at least, in explaining that you're not depending on a conflation of the words production and delivery. Right. Right. But now it seems like you are depending on a conflation of the word production and conversion. And I don't see how that is consistent with the plain meaning of production. Well, this goes back to our second basis for prevailing here. Talking about power production capacity of the facility, not of a subcomponent part, not of the solar array, not of... Facilities production strikes me as a different thing than conversion of what a facility produces. Well, two things can be true at the same time. The inverters convert direct current power to alternating current power. The facility as a whole produces 80 megawatts of alternating current power. You know, I think the point there is we always come back to what is the facility producing? Utilities want to focus on just a subcomponent part, the solar array, but they completely ignore part of the facility. Indeed, they completely ignore a component that is part of the electric generation process. As we state in paragraph 33 of our first hearing order, that's recounted at page 39 of our brief as well, and as is codified in our regulations. So, you know... Let me ask you, Mr. Fish, just to change gears a little bit. I just had one question about the intervention. I know that the decision to deny intervention is subject to a steep standard of review. It depends on whether there's an abuse of discretion. But I find myself wondering, what would have been the prejudice, if any, of allowing SCIA to intervene? Wasn't part of the time delay during a period when proceedings were told? It's a little surprising to me, frankly, what the commission did. And I wonder if you can help explain why, in this unusual situation, the commission wouldn't have exercised its discretion to allow intervention. Well, Your Honor, that would have opened a new door and set a new precedent. I mean, we have consistently denied late intervention after dispositive order. I understand that. That's why I emphasize this unusual situation. When it may have not been a full exercise of diligence, but it was explicable that SCIA thought, oh, this kind of big deal thing, you have a pending rulemaking, it's going into this very area. If they're going to change this, they're going to do it in the rulemaking, not in one of these many dozens of individual adjudications. I mean, so they were wrong. And so I could see a rule that's very narrowly key to this somewhat unusual way that the commission proceeded. It could be, Your Honor. And I think the court would probably have pulled that decision. But if you look at the regulation for late intervention, it says that we may consider several factors. One of those is prejudice. Another is good cause. And we don't have to consider both. We don't have to consider either. Here, we said there's no good cause. And there's good cause for saying there's no good cause, because SCIA, even in July of 2020, when Order 872 and the other proceeding came out, clarifying and making final that that proceeding would not consider the send-out rule, they still didn't intervene. They still didn't intervene before we issued our order here in September. They waited over two months until September 28, 2020. So they were on notice. In July of 2020, they were actually on notice back in October of 2019 when EEI raised this issue in their intervention motion. Was EEI raising, I assume EEI was raising this issue in any number of other applications for, I'm going to use the wrong terminology, applications for certification, that there are these dozens and dozens of these facilities, and they're seeking to be recognized as small power production facilities. So EEI is probably raising this everywhere. Would you expect the SCIA to be intervening in all of those proceedings? Not necessarily, Your Honor, but I think, you know, even if you don't take the October 2019 date as, you know, the basis for good cause, the July 2020 date certainly provides it. And I, because then they knew, they knew that the Order 872 proceeding wouldn't, you know, wouldn't have any bearing on the send-out. So they probably thought they were in the clear altogether. What's odd was then, given that, I think they thought they were home free. And then, whoa, this thing that you would think they would have done, if at all, they would have done in a rule, they decide to do in one of however many dozens of adjudications. That's curious. I think, I mean, I'm just trying to understand their... I understand the equity point, Judge Miller, but I think, you know, at the end of the day, this is a fundamental tenet of administrative law. We can make new policy through rulemakings or we can make it through adjudication. And that expression does not turn on the number of dockets that are open that might concern the same issue. That's really a question of, you know, whether there should be a statutory change or regulatory change that would bind us. But I think it's important, you know, this could be a case where, you know, assuming for the moment favorable facts to see that could create bad law, because that would potentially open the floodgates to us being required to grant intervention after a dispositive order issues in all sorts of cases, because we have lots of dockets open that deal with similar issues. And, you know, then there is the potential for very real prejudice. And I don't think that's consistent with the regulation that is written in permissive terms in any event. Could you prevail on Chevron 1? I mean, do you need the deference? I don't think we need the deference. As we explained in paragraph 23 of our first re-hearing order, the most reasonable interpretation of power production capacity of the facility is 80 megawatts, because that's the amount of useful power output. And that considers all of the component parts of the facility as a whole. But, you know, I think Chevron deference is, I think step two, is a reasonable place to land in this case, nevertheless, because, you know, we are talking about terms, power production capacity of a facility in a rather sui generis situation where you have both DC power and AC power. I think it's important to remember, you know, in the past, we're just talking about AC power. I don't know another occasion where we're talking about the conversion issue. And so the question was just, well, how much is being sent out to the grid? You didn't have this component that Congress did not anticipate back in 1978. Nevertheless, Congress charted a path forward by using the term power production capacity of a facility. It clearly wanted to focus on displacing fossil fuel firepower on the grid. The maximum ability of the Broadview facility to do that is 80 megawatts. I didn't have any more, but then your response to Judge Pillard led me to seek this clarification. Do you think you should win at Chevron step one? I know if you lose there, you think you should still win at Chevron step two. Do you think you should win at Chevron step? I mean, start by saying, I think we should win either way the court looks at it. I think if you take, say, the Kaiser versus Wilkie test for deference in agencies regulations, and you employ all the canons of statutory construction to determine the best meaning, I think you get to the most reasonable outcome here as being our determination, 80 megawatts. Reasonable has shades of Chevron step two. Maybe the answer is yes. Maybe the answer is no. Maybe the answer is you would rather not give an answer. But yes or no, do you think you should win at Chevron step? I definitely think we should win at step one. I also think we should win at- I want to be sure I understand the question and answer that's going on here. If there were no Chevron case, we were simply deciding the law in the first instance. Say this is 1983. We're before Chevron, and we're deciding the question as a matter of law. Would the correct interpretation be the one that the conviction arrived at in this case? Yes. Yes, absolutely. I want to make sure I understood where we're going with that question. Congress's intent under PURPA reports with a plain text reading of the statute when read in context. And if I could just make one final- Sorry. Make your final point. My final point would be until this case, Northwestern seemed to agree with us because in their own interconnection procedures, they say you calculate nameplate capacity, which is their load star. In terms of the alternating current generation of the facility, and in their interconnection agreement in this case, they said it's an 80-megawatt plant. Thank you, Your Honors. Thank you. All right. And finally, we'll hear from Mr. Lowe from Broadview Intervenor. Morning. Morning. May it please the Court, Robert Lowe for the Intervenor. The question here is whether the power production capacity of a power production facility should be measured by the potential capacity of a subcomponent in that facility or should be measured by looking at the facility as a whole. And it's really not unreasonable for the Commission to take the latter view. It's reasonable because the statutory language itself is key to the facility. It says a facility which has a power production capacity which is not greater than 80. Now, the facility, looking at all the components together, what the production will be here, everyone agrees, it is never greater than 80 megawatts. This is consistent. It's reasonable because it's consistent with what the Commission has held for 40 years. You look at the net output of the facility as a whole. As the Commission said, even the dissenting Commissioner, Danley, viewed capacity to referring to output. And as the Commission explained and as the Commission just said, that's how Northwestern understood it. Look at page 207, joint appendix, footnote 94, which explains that. It's also consistent with this court's reading of this statute. As Judge Brown said in the Southern California case, while looking at a qualified facility powered by the net output, and Judge Brown explained that this accords in the context of this statute, that they're looking at power production being used by the grid or in some other useful capacity. It also makes perfect sense in the context here where Congress is trying to incentivize the addition of additional domestic power to the grid, not some fictional power that is never produced in a useful fashion. It's also reasonable because it's consistent with how Congress used the term. It also speaks to sales of capacity, energy going to the grid instead of being installed from one company to another. If you look at 16 USC 824A, there's a number of provisions there all speaking to the sales of capacity. None of that makes sense if you're thinking of capacity in terms of a subcomponent. There's three other additional quick points. When Congress enacted this statute, it also included other sources of power such as hydropower, geothermal power, bio-waste. Those can potentially run 24 hours a day, seven days a week, 365 days, 80 megawatts all the time. Now, in the solar world, it's more challenging to have that level of capacity factor, but it shows that it's certainly not inconsistent with congressional aim here to have a facility which can get a greater capacity  It was fully anticipated by Congress it might even go up to 24 hours a day, seven days a week, 365 days a year. And so it's not circumventing or gaining the statute to design a facility so we can try to get close to the 80 megawatts. What's your response to Edison's or the utility's argument that the statute refers to transmission capacity a handful of times? And so we should read production capacity as different than transmission capacity of the facility. So what is leaving the facility? That sounds like transmission. What is leaving the facility? Or in your hypothetical, if it's being used by a direct customer in some other way, it's where the power is then being still used in a useful faction. That might be included as well. So it's a question as a facility, what is it producing that is useful to the grid or to some direct customer? As opposed to in some other hypothetical, you have a solar array there, which is producing power. In my hypothetical, the 499 would be transmitted. It just wouldn't be transmitted to the grid. So I still think that you are conflating a facility's power production capacity with the facility's power transmission capacity. And that seems problematic because Congress has distinguished elsewhere between production and transmission. Let's talk about that hypothetical. I think it's a helpful illustration. So if you have a facility which is producing 570 or whatever they said of megawatts of power from their huge solar array, and that is then going through inverters and being delivered 570 for different uses. So if it sends out 80 to the grid and then uses 490 internally, let's say they have some sort of pit mining farm facility there as part of the same facility, it's being used. I'm sure that's not this case, but FERC would look at those facts and say that energy, that AC power is being used internally by a direct customer that's being treated as useful power that is being produced by the facility as a whole. So whether it's being directed to the grid or elsewhere, that's something that FERC would look at. In this case- What if the pit mining farm used DC power? Would that still count as power production capacity? That's not how it works at all. If it did work that way, FERC would examine it, they're the expert agency, and they would assume to treat it as useful power being used in that fashion, would take that into account and treat that as being over- Everyone agrees that if we produce this facility, which is spelled out in our affidavit in the diagram, that it's physically impossible for it to produce as a facility more than 80 megawatts. No one argues that that power is being used for anything else but in the delivery of power to the grid. It's not being used by some pit mine or anything or anything else. It is only being used to deliver power to the grid, and everyone agrees that it's not 50 plus 80, 130, 24 hours a day, whatever. There's no period of time ever that it can be ever more than 80 megawatts, and megawatts is the amount of power that can be delivered on demand at any particular time. When you measure megawatt hours, it's a whole different subject. Congress knows how to legislate regarding megawatt hours. It does that elsewhere in FERPA and did not do so here. Ms. Job, I'm not sure I caught your answer to the transmission capacity question. I have to confess that I didn't linger on it because, you know, we have cases about transmission capacity, like the lines that take power from one place to another. Is that the distinction? That is the distinction. Those statutes are referencing the transmission of the power from one to the other, and there's power lost on the lines, et cetera. Here, we're talking about the facility as a whole and how much it can produce, and everyone agrees it's a physical matter, this facility, looking at it as a whole and all its subcomponents, can produce only 80 megawatts, and as Mr. Fish said, the inverters here are not a necessary component of this facility to produce any power at all to the grid, and under the FERPA regulations, they're considered to be a part of the electrical generating equipment. It's part of the electrical generation that's used to the inverters, and the only thing that comes out of the inverters is a maximum of 80 megawatts net power that can be used in the grid. All right, if you have just a sentence to wrap up, we've been lenient with everyone, why not you? And then we'll hear some remarks. I'll just conclude by saying that Northwestern's argument isn't just to reject this solar facility, but really would harm all solar qualifying facilities, which all use larger solar arrays, and which would limit their capacity. If you have an 80 megawatt solar array, you'd be limiting the production really to 57 to 64 megawatts, so here, this is really an attack not just on our facility, but on all  facilities. Thank you, Your Honor. Thank you. I think we have two counsel who have reserved two minutes for rebuttal, and we'll start with Mr. Marwell. Thank you, Your Honor. I appreciate the rebuttal time. Just four quick points, if I could. First, I'd like to try to take another shot at responding to Judge Sintel's question about the contents of the orders. I would just point you to JA200, which is paragraph 23 of the March 2021 rehearing order. That's where FERC said, in reference to this phrase, power production capacity, nor do these terms have commonly understood meanings that taken together speak directly to this question. I think that's hard to reconcile with the position in their appellate brief that capacity has this industry-specific I don't want to take your rebuttal time. I know you have three other points, but I guess there's a question about whether the word alone resolves something, or whether the word in context with structure, whatever. But go ahead. You have three more points. Thank you. I agree, and certainly our textual argument reads the three words together. That's why we think they're a very large solar facility. I was interested to learn the commission's view on that, that that would somehow be disqualified. It seems to me that is a problem for them. The crux seemed to be that behind the inverters or the on-site use would be for a useful purpose, and that's why they would add it and get over the problem.  don't think that would be upheld would that necessarily reach that. I think it's a separate question, but I understand. So goes one, so goes the other. I guess they would need a principle basis, I suppose, in that future case, but I took the basis that they provided or the response to be, well, that's power for a useful purpose as distinguished from losses or resistance or whatever, but I think that the problem is that describes here. The energy is being stored in the battery for a useful purpose. May I make the two other points very quickly? Thank you. On the last point, with respect to your question, can you chart a course that doesn't rely on the capacity definition in the commission's brief? I think if you look at pages 40-43 of their brief, it relies basically very exclusively on that definition, and if you are left with any doubt about what the commission itself would do, a remand will fix the issue, and the commission may well agree with their distinguished lawyers, but they may not, and that's the whole point. Thank you. Now we have two minutes from Ms. Curley. I have a very limited issue. Responding to Ms.   I think that the commission  agree that there would be concerns about a broad-reaching proclamation. I think I will encourage this court that some of the issues are the most pressing of our day. It is incredibly reasonable. It allows all voices to be heard where they need to be heard without disrupting the orderly conduct of business. The facts are unique and unusual and present why the decision for intervention should not be limited to timeliness. As I said earlier, for the agency to consider or consider this issue, we must be interveners in the proceeding. I have nothing more. It is a very limited issue. Thank you.
judges: Pillard, Walker, Sentelle